Lloyd W. SAHLEY, Plaintiff,

v.

TIPTON COMPANY, Defendant.

Civ. A. No. 3124.

United States District Court
D. Delaware.

Feb. 6, 1967.

See also D.C., 40 F.R.D. 495.

William E. Taylor, Jr., Wilmington, Del., and Alan E. Bandler, of Kramer, Bandler & Labaton, New York City, for plaintiff.

James M. Tunnell, Jr., David A. Drexler and Andrew B. Kirkpatrick, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION

LAYTON, District Judge.

Lloyd W. Sahley (Sahley), a resident of Ohio, brings this action against Tipton Company (Tipton), a Delaware corporation, to void certain transfers of money and property to it from Mark T. McKee, a judgment debtor of Sahley. Tipton Company is wholly owned by Mark T. McKee's twelve children. Jurisdiction is based on diversity of citizenship. This opinion follows a trial to the Court on the merits.

Many of the facts of this action are in dispute, but previous court adjudications by the United States District Court for the Southern District of New York have established much of the factual background to the satisfaction of this Court. Sahley is a consulting engineer and designer. Mark T. McKee is a director and consultant of several corporations and specializes in effecting corporate mergers and consolidations. Sahley and McKee met in New York City in late 1957. That meeting eventually led to an agreement to form a joint venture, to pool Sahley's engineering talents with McKee's financial contacts to arrange sales or mergers of existing companies. They were to share equally in whatever fees or commissions were earned.

Sahley and McKee were instrumental in causing Guerdon Industries (Guerdon), a manufacturer of mobile homes, to be sold to Ladenburg, Thalmann & Co. (Ladenburg) in 1959. Out of this venture, the Sahley-McKee joint venture earned fees totalling $250,000. All of the fees were paid to McKee, half of which should have been paid over to Sahley. However, of this share of $125,000.00, Sahley received only $38,000.00.

Sahley commenced an action against McKee in 1960 in the United States District Court for the Southern District of New York, seeking payment to him of the rest of his share of the Guerdon-Ladenburg fees. After a full trial on the merits, the Court found the foregoing facts, and awarded judgment to Sahley in the sum of $87,000.00 plus interest. The United States Second Circuit Court of Appeals affirmed the judgment (slightly modifying it as to interest). Sahley et al. v. McKee et al., 371 F.2d 720 (2d Cir. 1967).

The New York judgment remains unsatisfied except to the extent of $7,587.33 by Sheriff's Return and $33,333.00, together with interest of $3,000.00, paid into the Clerk of the Court of the Southern District by order of the Southern District Court, dated November 26, 1965. Mark T. McKee is now without visible assets, as indicated by the limited amount received by the Sheriff's Return.

Between October 12, 1959, and April 25, 1960, McKee received five checks, totalling $118,361.66, from the Guerdon and Ladenburg interests, which represented portions of the fees due to him and Sahley. Each of these checks was endorsed by McKee to the order of Tipton Company, and deposited to the Tipton Company bank account.

In the instant action, Sahley has attempted to prove that these conveyances of money from McKee to Tipton are void under either of two theories, both arising under provisions of the Uniform Fraudulent Conveyance Act, §§ 4, 5, 6 and 7.[1]

1. The Uniform Fraudulent Conveyance Act has been enacted in every state which has a possible connection with this action. 6 Del.C. § 1301 et seq.; 19 Mich.

The plaintiff alleges three counts in his complaint. Under his first theory, he alleges that McKee conveyed to Tipton $120,000.00 or more in money and other property,[2] said conveyances being made without consideration. Further, it is alleged that the conveyances were made with the intent and purpose of hindering, delaying and defrauding McKee's creditors, in particular, the plaintiff, and that said conveyances were made on a secret trust agreement that such money and property be held for the benefit of McKee. Finally, plaintiff charges that Tipton's acceptance of these transfers was with full knowledge of, and acquiescence in, McKee's intent to defraud his creditors.

Plaintiff's second count alleges the existence of the joint venture agreement between Sahley and McKee, and that the joint venture earned and was paid $250,000.00. Further, it alleges that McKee, in breach of the joint venture agreement, conveyed in excess of $120,-000.00 of said joint venture funds to Tipton for ·his own private purposes. Finally, it alleges that Tipton received such payments in bad faith.

Plaintiff included a third count in his complaint, but in view of the conclusions here reached, it need not be considered.

After reviewing the testimony and the evidence introduced at the trial, the Court finds that there is substantial evidence to support plaintiff's contentions under both of the first two counts to his complaint.

Preliminarily, the circumstances surrounding the formation of Tipton Company need explanation. In 1936, Mark McKee determined to place a substantial portion of his assets in trust for his children. At that time, he was a man of substantial means, with an income in excess of $50,000.00 yearly. In addition, he owned a one-third interest in two substantial family businesses. He found it desirable for tax reasons to divest himself of some of his dividend income and provide for the future of his children at the same time. In conjunction with his brother, he established *inter vivos* trusts for the benefit of each of his eleven children (and the children of his brother). These trusts were to exist for twenty-one years, at which time their assets were to be distributed to the trust beneficiaries. A twelfth child was born in the early 1940's, and shortly thereafter, a similar trust was established for him.

During the existence of these trusts, Mark T. McKee, as trustee, distributed some of the income to his children, but the major part of the income was reinvested in additional stock of the family corporations. The trusts expired in October, 1957. In order to prevent the dissemination of the family assets among the twelve children, it was decided with their consent, to put the corpus of all the trusts into a corporation, the shares of which were distributed equally among the twelve children. A corporation had been organized by Mark T. McKee in Delaware a few years before, but as of 1957, it was merely a corporate shell, no stock ever having been issued. This corporate shell was utilized for the children's corporation and its name changed to Tipton Company, named after the birthplace of their father, Mark T. McKee.

Shortly after its formation, Mark T. McKee began to withdraw sums of money from Tipton Company. Defendant maintains these were "loans." It is these sums that Tipton now claims are the antecedent debt representing the consideration for the Guerdon and Landen-

Stats.Anno. § 26.881 et seq., Comp.Laws 1948, § 566.1 et seq.; New York Debtor and Creditor Law, McKinney's Consol. Laws, c. 12, § 270 et seq. Connecticut's Fraudulent Conveyance Act is similar. § 52–552 General Statutes of Connecticut.

2. Plaintiff's allegation that McKee conveyed to Tipton "between 1960 and date hereof" in excess of $120,000.00 is deemed amended to conform to the proof at trial that the conveyances actually commenced in 1959.

burg checks paid over to it in 1959 and 1960 by Mark T. McKee.

■ It is interesting to note that since before the formation of the trusts until the present time, Mark T. McKee always has had the financial benefit of his original holdings in the two successful family corporations. For twenty-one years, as trustee for each of the twelve trusts, McKee had complete control over the income earned by this stock, whether to reinvest the money, accumulate it, or pay the income to the beneficiaries of the trusts. There is nothing in evidence to indicate exactly how much was ever paid to the beneficiaries during the existence of the trusts, but according to the testimony, only a small portion of the income was ever paid over to the children. And since the termination of the trusts, Mark T. McKee has had full access to all of the assets of Tipton Company, "borrowing" money from it whenever he needed it, no matter how much he needed, without any contemporaneous evidence of the "loan", except for the check itself, and with no repayment date ever sought or given. At least since 1957, it is possible to find from the evidence before the Court that, while ostensibly owned by the McKee children, the assets of Tipton Company were and are really no more than Mark T. McKee's personal bank account, for him to do with whatever he wanted.

The Court finds that these withdrawals from Tipton Company, at least until the year 1963 or later, were not bona fide loans. There is nothing except the present testimony of the McKees which indicates that these specific withdrawals were ever considered loans until after this litigation was commenced. It is curious that Tipton Company has never kept even the simplest books or records to show its financial accounts. The balance sheets on its income tax returns are not sufficient by themselves to prove that the payments to Mark T. McKee were in the form of loans, and in addition, the balance sheets submitted to the Delaware Secretary of State in Tipton Annual reports conflict, in some

years, with the income tax balance sheets. These discrepancies have not been satisfactorily explained. The Delaware reports for the years ending October 1961 and 1962 do not state as "assets" enough to include the amounts now claimed to be loans.

There are some curious discrepancies in the stories of Mark T. McKee and his son Miles concerning the Guerdon and Ladenburg moneys as repayments of outstanding "loans." Miles testified that, in connection with a $33,333.00 payment made to Tipton, which represented an overpayment of some $26,000.00 at that time, he and his father had a face to face conversation concerning the fact that the older McKee had made the overpayment. The elder McKee said, according to Miles, "You can't get better credit than that." Both McKees, Miles said, "enjoyed the discussion."

Mark McKee's testimony on these payments is significantly different. He testified that the April 25, 1960 payment of $33,333.00 and others were *mailed* in to his son, not delivered in person. Surely, when $33,333.00 is transferred from one person to another, it would be a significant enough event for both parties to remember whether the payment was made by mail or in person. Whose story is the correct one is not important; rather, the fact that the stories conflict is indicative of a shortcoming in credibility. Moreover, the idea of Mark McKee paying over to Tipton some $26,-000.00 more than he currently owed is so odd as to suggest there might be more to it than meets the eye.

Finally, and most damaging to the "loan" theory is testimony under oath of Mark T. McKee, in a supplementary proceeding before the New York Southern District Court [and before the instant action was commenced], that the first loans he ever took from Tipton were six or seven years after the corporation was formed, that is in 1963 or 1964. This is in direct conflict with his testimony before this Court that as early as 1957, he began to borrow money from Tipton. On the whole, then, the defend-

ant's evidence is neither sufficient nor entirely credible to prove to the satisfaction of the Court that the payments made to Mark T. McKee over the years by the Tipton Company were bona fide loans.

Returning to the first count of plaintiff's complaint, the Court finds that there is substantial evidence to support each allegation. Five checks in the amount of $118,361.66 from Ladenburg and Guerdon, representing Sahley-McKee joint venture funds, are in evidence. Each was made payable to Mark T. McKee and each endorsed by him to Tipton Company. Tipton argues that these checks were received in exchange for fair consideration, the antecedent loan debts, but it has already been found that the "loans" were not bona fide. Thus, the $118,361.66 payments were made without consideration.

Plaintiff alleged that these conveyances were made with the intent and purpose of hindering Mark T. McKee's creditors, especially Sahley. Intent is most difficult to prove, as it requires a subjective examination into the mind and can be proved only by circumstantial evidence. It is well settled that in an intra-family transaction, as these transactions must be characterized, a heavier burden is placed upon the grantee to establish fair consideration for the transfer. 37 C.J.S. Fraudulent Conveyances §§ 419, 421; Bibo v. Burnett, 14 F.Supp. 948 (E.D. Ill.1936).

Here, Tipton has failed to meet this burden to show fair consideration, since the so-called loans are not bona fide. Since no consideration has been shown, an inference can be drawn to show a fraudulent intent, at least on Mark T. McKee's part. There is other evidence which is indicative of his fraudulent intent to deprive Sahley of property.

Other courts have already held that McKee made an effort to defraud Sahley of the fruits of the Sahley-McKee joint venture. In this connection, Judge Murphy, in the Southern District of New York, in his opinion following the New York action between Sahley and McKee, stated that McKee had attempted to defraud Sahley by changing the terms of a May, 1959 agreement with Ladenburg concerning the amount of the fee to be earned by the joint venture.

In a related proceeding in New York, Judge Cannella, of the same Court, found that McKee had attempted to defraud Sahley when in December, 1963, on the eve of the trial before Judge Murphy, McKee assigned to Tipton the third installment of $33,333.00 of the Ladenburg money,[3] part of the very subject matter of the litigation then pending. The assignment was held invalid under § 7 of the Uniform Fraudulent Conveyance Act (§ 276 New York Debtor and Creditor Law).

In addition, the self-serving testimony of McKee and members of the McKee family to the contrary, it appears clear that several of his sons, who were stockholders and officers of Tipton Company, also knew of the McKee-Sahley arrangements, and knew exactly what these large checks given to them by their father represented, and thus are held to have shared in their father's intent to defraud Sahley. There is adequate evidence to infer that Tipton Company was on notice of the nature of the McKee-Sahley relationship, and exactly what the money it received represented.

First, there is the testimony of Sahley of conversations with members of the McKee family at different occasions. On several occasions, McKee's sons were present with their father when he was with Sahley. Several of McKee's sons attended a Thanksgiving dinner at Sahley's house in 1959 where the general subject of the recent Sahley-McKee venture was discussed. Mark T. McKee, Jr., an officer of Tipton, signed three notes, and a chattel mortgage, personally

---

3. This is the $33,333.00 that was later paid into court in New York and is in partial satisfaction of Sahley's judgment against McKee.

obligating himself to a possible payment of $97,000.00 which were part of the written partnership agreement between Sahley and Mark T. McKee. Mark T. McKee, Jr., did not testify as to his signature on these documents leaving an inference that his testimony would have been unfavorable to the defendant, that is, showing knowledge of his father's transactions with Sahley.

Miles McKee, Mark T. McKee's oldest son, handled much of his father's financial affairs and spoke to him frequently, often several times a week, in person and over the telephone. Their offices in Detroit were in the same suite of an office building. Miles McKee testified that he had no knowledge at the time of the Sahley-McKee venture in the period 1959–60. This testimony taxes one's credulity and simply cannot be believed.

In sum, it is a fair inference that several of McKee's sons, at least two of whom were Tipton officers and directors, had ample knowledge of their father's relationship with Sahley, and knew, or should have known, what money the five checks endorsed to Tipton represented. It also is fair to say that Tipton Company, as transferee of these conveyances of money, shared in Mark T. McKee's fraudulent intent to deprive Sahley of his share of the joint venture receipts. The Court so finds.

■ There is substantial evidence to support plaintiff's allegation that the moneys so conveyed to Tipton by Mark T. McKee were made on a secret agreement and trust that such money and property be held for the benefit of McKee. The transfers in question must be subject to, and have received, special scrutiny, since they were within the framework of a confidential family relationship. Heath v. Helmick, 173 F.2d 157, 161 (9th Cir.1949).

Since 1957, McKee has had the advantage of the assets of Tipton Company, when and as needed. He has withdrawn from the company amounts ranging from as little as $7.63 to as much as $15,-000.00, and usually in the range of $1,-000.00 to $10,000.00. On an average,

there have been twenty or more withdrawals each year since 1957. These withdrawals were made whenever McKee asked for them, with no questions asked by Miles McKee, who handles the business affairs of the corporation.

Mark McKee had apparently devised a plan to use his assets in such a way that any given creditor could not attach them. While he had the use of, literally, hundreds of thousands of dollars each year, never were his funds in such shape as to permit attack by creditors. In some cases, Mark McKee paid a personal bill by simply calling Miles and telling him to whom and how much to make out a Tipton check. In other cases, a check would be made out and sent directly to Mark T. McKee, or to his personal checking account. In addition, of 89 checks deposited directly into his personal checking account during the period 1958 through 1964, 73 of these went to cover overdrafts he had made on his own account. These payments, considered with the surrounding circumstances, establish to the satisfaction of the Court the existence of a secret trust for the benefit of McKee.

■ In this connection, the defendant has come up with a new argument, first put forth at oral argument after the trial. Tipton argues that, conceding arguendo that plaintiff has established the elements of a case of fraudulent conveyances, plaintiff cannot recover because Tipton turned back to McKee more than the $118,361.66 fraudulently conveyed before Sahley was a judgment creditor of McKee, and even before Sahley could have been McKee's judgment creditor. This argument is superficially persuasive but will not stand close examination. Concededly, there is a rule, the outgrowth of a few cases having unusual facts, holding that a fraudulent transferee may purge himself of wrongdoing by acts subsequent to the wrongful transfer. 37 C.J.S. Fraudulent Conveyances § 59; 24 Am.Jur., Fraudulent Conveyances, § 113. Guterman v. Adams, 22 F.Supp. 669 (D.C.Mass.); McCord & Nave Mercantile Co. v. Bur-

son, 38 Kan. 278, 16 P. 664; Hutchins v. Sprague, 4 N.H. 469 and Taylor v. Collins and Taylor, 222 Ky. 61, 299 S.W. 1097, are cited as standing for this proposition. But the facts of these cases are quite different from the case at bar. Typical of the cases is Taylor v. Collins and Taylor, supra, where debtor fraudulently deeded his home to his wife. Thereafter B, a creditor of debtor, levied on the house but C, the wife's nephew, paid off B in order to save his aunt embarrassment. D, another creditor of debtor, subsequently levied on the house upon the theory that the original transfer was in fraud of creditors. But the Court voided this later levy upon the theory that C's payment to B purged the fraud.

■ It may be true that subsequent to the original fraudulent conveyance Tipton turned back to McKee in excess of $118,361.66 before Sahley became a judgment creditor. But that was not done with any intent of curing or purging the original fraud. Unlike Taylor v. Collins and Taylor, this fraud was not purged by the payment by Tipton to McKee's creditors of a sum equal to, or in excess of, $118,000.00. There was no exact testimony as to how this money was spent.[4] While there is evidence in general terms that some of it was earmarked for creditors, the exact amounts were never catalogued and totaled. For all the record discloses, a large amount of this sum may have been, and probably was, spent by McKee for himself and family.

From the record here, the fair inference can be drawn that the Tipton arrangement was conceived in fraud and continued in fraud which was never purged within the meaning of the rule

relied on by the defendant. This argument is not persuasive.

The Court thus finds satisfied and proved each allegation of the plaintiff's first count. § 4 Uniform Fraudulent Conveyance Act.[5]

■ Plaintiff's second count is equally proved. Plaintiff realleges the preliminary assertions that Mark T. McKee is a judgment creditor of Sahley, which judgment remains, for the most part, unsatisfied, and that the sole stockholders of Tipton Company are McKee's children. The count goes on to allege that prior to July 1959, plaintiff and McKee entered into the aforementioned joint venture agreement, which has been proved and established before this Court by the findings following the New York trial before Judge Murphy. That the joint venture earned and was paid $250,000.00 by the Ladenburg and Guerdon interests has been similarly established here. This count then alleges that McKee, in breach of the joint venture agreement, conveyed, for his own private purposes, in excess of $100,000.00 of such joint venture funds, to Tipton. This has been proven (see discussion, supra) by the five checks, totalling $118,361.66, which are in evidence.

The most crucial allegation under this second count is that Tipton received the money in bad faith. The Court finds this allegation proved. It has already been demonstrated that the McKee sons, who were the officers and directors of Tipton, had knowledge of their father's joint venture arrangement with Sahley and knew from whom the joint venture would be receiving its fees. Tipton thus can be held to have well known what the five checks represented which McKee endorsed over to it. Under the circumstanc-

---

4. There is very general testimony by McKee that he lost large sums on a turkey farm and that substantial amounts of moneys received from him from Tipton went to pay creditors of the farm operations, but no attempt was made to prove how much or to whom these payments were made. Indeed, the suspicion lingers from the evidence that the farm was owned by Tipton itself.

5. "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

es, the Court believes that plaintiff has established that Tipton received this money in bad faith. The plaintiff's second count in his complaint is proved, and sets forth, as does the first count, a claim upon which relief should be granted. § 7 Uniform Fraudulent Conveyance Act.[6]

During the course of trial, there were several objections to the introduction of evidence. The Court allowed the testimony subject to objection. Upon review, none of the objections are thought to be of substance and all the evidence will be allowed to stand. This opinion shall constitute conclusions of law and findings of fact. Judgment for the plaintiff for the amount of the New York judgment together with interest less any payments already made in New York on account.

Let an order be submitted in accordance herewith.

6. "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."