In re Louis FLEET, Debtor.

Louis FLEET, on behalf of himself and all others similarly situated, Plaintiffs,

v.

John J. RHODE a/k/a Jack Rhode, Lorraine Rhode, and United States Consumer Council, Inc., Defendants.

Bankruptcy No. 81–04969K.
Adv. No. 87–0394S.
Misc. No. 88–285.

United States District Court,
E.D. Pennsylvania.

July 7, 1988.

Henry J. Sommer, Philadelphia, Pa., for plaintiffs.

Barry J. Hockfield, Wayne Powell, Cherry Hill, N.J. for defendants.

Edward Sparkman, Philadelphia, Pa., trustee.

ORDER

FULLAM, Chief Judge.

AND NOW, this 7th day of July, 1988, it is hereby ORDERED and DECREED as follows:

1. The Proposed Findings of Fact and Conclusions of Law of the Bankruptcy Court are adopted;

2. Judgment is entered in favor of the Plaintiffs and against the Defendants in this proceeding.

3. Defendant LORRAINE RHODE is enjoined from disposing of the premises known as 446 Pricketts Mill Road, Tabernacle, New Jersey, pending maturity and liquidation of the Plaintiffs' claims.

## REPORT AND RECOMMENDATIONS OF BANKRUPTCY JUDGE

DAVID A. SCHOLL, Bankruptcy Judge.

### A. PROPOSED FINDINGS OF FACT

1. The instant adversarial proceeding, filed on April 28, 1987, by the named Plaintiff, was certified as a class action pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7023 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 23(b)(2), on September 30, 1987, which could be maintained on behalf of, essentially the same plaintiff class certified[1] also by Order of September 30, 1987, in a related adversary proceeding in this Chapter 13 bankruptcy case, Adv. No. 83–0880K (hereinafter referred to as "the Primary Action").[2]

2. In this proceeding, the Plaintiff seeks to set aside two allegedly fraudulent conveyances of the residential realty of Defendants JOHN RHODE (hereinafter referred to as "Rhode") and LORRAINE RHODE (hereinafter referred to as "Lorraine") located at 446 Pricketts Mill Road, Tabernacle, New Jersey (hereinafter referred to as "the Premises"), and presently titled to Lorraine only.

3. The Primary Action was filed on March 31, 1983, charging that the Defendants, UNITED STATES CONSUMER COUNCIL, INC., a New Jersey-based corporation (hereinafter referred to as "USCC"); Rhode, the principal of USCC; and several individual subordinate employees of USCC had engaged in certain illegal and deceptive practices in providing services to distressed debtors who were the clientele of USCC, in violation of consumer protection laws of New Jersey and Pennsylvania.

4. After a Motion to Dismiss the Primary Action was denied by our predecessor, the Honorable William A. King, Jr., in an Opinion of October 15, 1985, reported at 53 B.R. 833, the Defendants failed to answer the Complaint or make requested discovery, and a default judgment on the issue of liability only was entered against USCC and Rhode only on June 12, 1986, by the Honorable James McGirr Kelly of our district court, acting on Proposed Findings of Fact and Conclusions of Law certified to him by Judge King.

5. On March 2, 1987, Judge Kelly entered an Order adopting our Proposed Findings of Fact and Conclusions of Law in response to a Motion of Rhode to set aside the default judgment, and denying that Motion, reported at 70 B.R. 845.

6. In denying the Motion described in Findings of Fact 5 *supra,* we concluded that Rhode and his counsel made a calculated decision to attempt to ignore the judgment entered in the Primary Action because they perceived it to be an action directed at judgment-proof entities and hence not worthy of defense until the Plaintiffs in that action filed a motion to prevent Rhode and Lorraine from alienating the Premises, which was granted by us on October 16, 1986. 70 B.R. at 849,

---

**1.** The class certified in this proceeding was defined as all persons "who have paid any money to the Defendants for advice regarding bankruptcy or any other legal matter, for assistance in preparing a bankruptcy case or any other legal service, or assistance from the Defendants as expert financial consultants."

**2.** On August 18, 1987, we issued a detailed Opinion in that proceeding, reported at 76 B.R. 1001,

conditionally certifying the class in the Primary Action pursuant to B.R. 7023 and F.R.Civ.P. 23(b)(3). After a hearing of September 24, 1987, we determined that the conditions of our certification were met, and we issued the final certification Order on September 30, 1987. In that same Order, we included a Pre-trial Order contemplating, *inter alia,* the final trial in that proceeding on June 14, 1988.

850, 851. We also specifically found contentions of Rhode and his counsel that they were unaware of the entry of the default judgment until receipt of the motion concerning alienation of the Premises "unworthy of belief and ... not credible." 70 B.R. at 849.

7. In our decision on class certification in the Primary Action, we granted the motion in conjunction with a finding that the default judgment extended only to the named plaintiffs rather than to unnamed class members as well. *See* 76 B.R. at 1005–08.

8. After trial of the instant proceeding on January 12 and January 15, 1988, we requested the parties, upon receipt of the transcript, to file Proposed Findings of Fact, Conclusions of Law, and Briefs. The foregoing were all received by March 31, 1988, although the Plaintiffs' opportunity to file a Reply Brief, which they ultimately declined, did not expire until on or about April 12, 1988.

9. The Premises was originally purchased on June 30, 1982, by the USCC with a downpayment of $50,000.00 made out of corporate funds of USCC.

10. Rhode testified that the property was placed in the name of USCC to enable that entity to borrow funds to expand into a large nationally-franchised enterprise.

11. On September 28, 1982, USCC transferred the property to Rhode and Lorraine for a recited consideration of one ($1.00) dollar.

12. In explaining the reason for this transfer, Rhode testified that, by September, 1982, just three months after the initial purchase of the Premises, it had become apparent that the franchising scheme was unworkable, and that this realization motivated this transfer.

13. Rhode contended that consideration existed for this transfer, despite a lack of any documentation, including any loan documents, in that it constituted a recovery of investments of approximately $20,000.00 made to the business by Rhode and Lorraine.

14. The business began in 1980 with a single location, which was relocated on one occasion, in Camden. Offices were also opened in Newark, New Jersey, in April, 1982, and in Washington, D.C., in July, 1982.

15. The Newark and Washington offices were closed in January, 1983, and the Camden office stopped seeing new clients in February, 1983, and closed in March, 1983, about the time of the filing of the Primary Action.

16. On January 28, 1983, Rhode transferred his interest in the Premises to Lorraine for a recited consideration of one ($1.00) dollar.

17. Rhode testified that the motivating factor for this transfer was personal health problems which he believed might be fatal and that, accordingly, he wished to protect the Premises from any claims by his former wife for alimony or support. The Defendants' counsel suggested, in his Brief, that consideration existed in Rhode's desire to repay Lorraine for her investment in USCC, but that there is no testimonial support in the record therefor.

18. At the time of both transfers, the equity in the Premises was at least the $50,000.00 invested in it, and, although no evidence was presented on this point, we assume that this value has significantly appreciated since 1983.

19. In his original deposition in aid of execution of the default judgment against USCC and him, entered into the record here with another pre-trial deposition, Rhode testified that the only assets of USCC at any time other than the Premises were "[s]ome typewriters, xerox machine ... [s]econd hand ..." that he sold "for junk when the office closed. They weren't worth anything;" and desks and file cabinets that were "all junk" and that he either gave away or couldn't even give away. Pre-trial examination of John J. Rhode, September 18, 1986, at 27, 28, 41.

20. At trial, by way of contrast, Rhode claimed that, in 1982, he had purchased four brand new typewriters at $500.00 apiece, a microfiche machine, and had several desks worth hundreds of dollars which

were utilized by USCC. However, although stating that some of these items were sold as well as given away, he provided no specific information as to the dates, transferees, or amounts paid in any sales. In his post-trial submissions, the Defendants' counsel contends that the business had certain "good will," but no testimony supported this contention and no value was attributed thereto.

21. As we previously noted in Finding of Fact 6, pages 421–22 *supra*, Rhode's credibility is suspect generally. We find that he has altered the facts to best serve his advantage both in his testimony on the Motion in the Primary Action and, as indicated in Findings of Fact 19 and 20 *supra*, here as well. We therefore find that his credibility generally, and particularly his testimony at trial regarding the saleable value of USCC's property, is not believable. We believe that his recitation regarding the saleable value of USCC's asset in the depositions, as set forth in Finding of Fact 19, is the most accurate assessment.

22. We therefore conclude, from the foregoing testimony, that the fair, saleable value of the assets of USCC, as of September, 1982, were little or nothing, and that the only saleable asset that it owned, at any time, was the Premises.

23. As of September, 1982, USCC and Rhode personally, as a guarantor, were obligors on three real estate leases, one of which (Camden) extended for one year and two of which (Newark and Washington) extended for two years, and on a contract to purchase a copying machine. While Rhode testified that the periodic payments, as well as payment of all salaries and other bills of USCC, were current as of September, 1982, the obligations undertaken in Newark and Washington ultimately resulted in claims against USCC and Rhode when USCC vacated these offices shortly thereafter, which were resolved by monetary payments in partial settlement by Rhode individually, on his personal guarantees, of $1,200.00 and $2,500.00 respectively at some indeterminate date in 1983. The copier was ultimately repossessed and this contract was ultimately the basis of a deficiency claim of at least $1,500.00 against Rhode personally and USCC.

24. The claims of the two named Plaintiffs holding valid judgments in the Primary Action against USCC arose from transactions occurring in November, 1981, and March, 1982.

25. The New Jersey Division of Consumer Affairs (hereinafter referred to as "the NJDCA") initially presented complaints to USCC about the use of its emblem suggesting a governmental affiliation in 1981. Although this matter was resolved in early 1982, the NJDCA raised additional consumer complaints with USCC in late 1982, and commenced an investigation which resulted in a consent judgment against, presumably, both USCC and Rhode in the amount of $7,000.00 in 1985.

26. The Plaintiffs also contended that several hundred class members had potential claims against USCC and Rhode as of September, 1982, but no particular individuals other than the named Plaintiffs in the Primary Action were identified, nor were the amounts of any claims of such parties placed in the record.

27. On October 1, 1982, the then Standing Chapter 13 Trustee in the Philadelphia Division of this court commenced a defendant class action in this court against a number of businesses which were allegedly providing misleading advice to consumers seeking assistance in filing bankruptcy, *O'Connell v. David*, 35 B.R. 141 (Bankr.E. D.Pa.1983). On January 13, 1983, counsel for the Trustee notified USCC that it was one of the targets of the lawsuit. However, the ultimate disposition of this matter by the district court, reported at 35 B.R. 146, *aff'd*, 740 F.2d 953 (3d Cir.1984), resulted in injunctive relief only against the named defendants and several other specifically identified entities, including the named USCC, although class certification was denied.

28. USCC was current on all tax liabilities through 1982, although it amassed a tax delinquency of at least $10,000.00 thereafter.

29. As an individual guarantor on the leases and contract for the offices and the

copier, respectively, Rhode was liable for these obligations.

30. At the time of the January, 1983, transfer of his interest in the Premises to Lorraine, Rhode's only other asset, except for his personal effects given no value, was a Lincoln automobile, which he had purchased new in spring, 1982, making a down payment of $7,000.00.

31. Rhode testified, that, a few months after the transfer of the Premises, he sold the automobile to pay off delinquent income taxes arising from the 1981 and 1982 tax years for about $8,000.00 to $9,000.00, leaving a balance of taxes due of $6,000.00 to $7,000.00.

32. No other assets owned by Rhode of any value as of January, 1983, were identified. The only other liabilities of Rhode as of this date which were identified were debts to his former wife for alimony or child support arising in the late 1950's which he believed to be about $14,000.00.

## B. PROPOSED CONCLUSIONS OF LAW

1. The parties agree that this is a non-core, related proceeding, consistent with the conclusions of Judge King in his Opinion of October 15, 1985, in the Primary Action. See 53 B.R. at 837-38. Consequently, although we have jurisdiction to hear this matter, we must submit Proposed Findings of Fact and Conclusions of Law to the district court in order that it may enter the final order or judgment in this proceeding. See 28 U.S.C. § 157(c)(1).

2. The parties agree that, since the Premises is situated in New Jersey and that state was the primary place of the business of USCC and Rhode, this proceeding should be decided under New Jersey law. See Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280, 283-84 (3d Cir.1980); In re Windsor Communications Group, Inc., 80 B.R. 712, 722-23 (Bankr.E.D.Pa.1987); and In re DSC Industries, Inc., 79 B.R. 244, 247-48 (Bankr.E.D.Pa.1987).

New Jersey has enacted the Uniform Fraudulent Conveyance Act, N.J.S.A. 25:2-1, et seq. (hereinafter referred to as "The

UFCA"). Pennsylvania has also enacted the UFCA, at 39 P.S. § 351, et seq., and hence the relevant law of both states is identical.

3. The Plaintiff class members are creditors of USCC and Rhode, the parties whose conveyances of September 28, 1982, and January 28, 1983, they are seeking to invalidate, and hence they clearly have standing to maintain this action pursuant to N.J.S.A. 25:2-3.

The named Plaintiff in this action, LOUIS FLEET, has a district court default judgment against both USCC and Rhode which has withstood a motion attacking it. See 70 B.R. at 746. Although the unnamed class members, except SARAH MORRISON, the other named Plaintiff in the Primary Action, possess only contingent claims which have not been reduced to judgment, such claims are sufficient to provide standing to such parties to maintain this action. See, e.g., Lomonaco v. Goodwin, 108 N.J.Super. 83, 86-87, 260 A.2d 10, 12 (1969); Deerhurst Estates v. Meadow, 70 N.J.Super. 404, 409, 175 A.2d 662, 664 (1961); and Baker v. Geist, 457 Pa. 73, 77-78, 321 A.2d 634, 636 (1974).

4. USCC and Rhode were each insolvent at the time of their respective transfers, i.e., on September 28, 1982, and January 28, 1983.

The UFCA defines "insolvency" as the state "when the present fair saleable value" of the judgment debtor's assets "is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.J.S.A. 25:2-8. Moreover, the UFCA definition of "Debt" embraces "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." N.J.S.A. 25:2-7.

This is an extremely broad definition of insolvency. It can be met merely by showing that, at the crucial date of transfer, the debtor's liabilities exceeded the debtor's assets, which is the "balance sheet" test for insolvency recognized in the Bankruptcy Code in assessing liability under 11 U.S.C. § 547(b). Compare In re Art Shirt Ltd.,

68 B.R. 316, 322 (Bankr.E.D.Pa.1986), *aff'd*, C.A. Nos. 87–1175 and 87–1176 (E.D.Pa. March 10, 1988) [available on WESTLAW, 1988 WL 26820]. As explained in a case quoted at length with approval in 4 COLLIER ON BANKRUPTCY, ¶ 547.26, at 547–107 to 547–108 n. 3 (15th ed. 1987), *McGill v. Commercial Credit Co.*, 243 F. 637, 646–49 (D.Md.1917), the bankruptcy solvency test has traditionally been stringent, due to the vestige from the day of commonplace involuntary proceedings that "a man ought not to be forced into bankruptcy if, at a fair valuation of his possessions, he has more than he owes." *Id.* at 647.

The common-law insolvency test under the UFCA is addressed in *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 (3d Cir.1986). There, the court quotes, with approval, *Larrimer v. Feeney*, 411 Pa. 604, 608, 192 A.2d 351, 353 (1963), wherein it is said that UFCA insolvency embraces not only insolvency in the bankruptcy sense, but also "'a condition wherein a debtor has insufficient present saleable assets to pay existing debts as they mature.'" This test of insolvency is hence not a difficult test to meet: "in panic times, and during the earlier portions of the periods of depression which follow, an enormous majority of merchants," *McGill, supra*, 243 F. at 646, though able to pay their bills, are, under the UFCA definition of the term, insolvent.

■ When the ease of meeting this insolvency test and the fact that contingent debts must be counted in determining the "existing debts" which must be less than the debtor's saleable assets to avoid the sweep of the broad common-law definition of insolvency are appreciated, it can be readily concluded that both debtors, at the crucial moment of the conveyances under attack, were hopelessly insolvent. The fact that they were in fact paying most or all of their respective debts as they fell due at or about the dates of the respective conveyances is therefore not conclusive nor does it tend to strongly support a conclusion that they were not insolvent, as they appear to argue.

■ In Finding of Fact 22, page 423 *supra*, we concluded, with little hesitation, that USCC had little or no saleable assets as of September 28, 1982. This conclusion is supported by our determination that Rhode's credibility that USCC had certain assets of value is suspect, in light of his earlier deposition testimony that in fact USCC had no assets of any saleable value. This conclusion is further strongly supported by noting that, when all of the USCC offices closed within six months thereafter, Rhode, despite his incentive to do so to meet the claims raised against both USCC and him, as guarantor, by USCC's creditors, was forced to reach into his own shallow pocket to make payment rather than being able to satisfy the creditors from the proceeds of the liquidation of USCC's assets. Again, we emphasize that it is the liquid, saleable nature of the assets —those which could be liquidated to satisfy creditors if necessary—which alone are significant for purposes of N.J.S.A. 25:2–8.

We seriously question whether USCC's 1983 income tax obligations, which had not yet been assessed, could be counted in the insolvency equation. *See Edelson v. C.I.R.*, 829 F.2d 828, 834 (9th Cir.1987). We also question whether the claims of the unnamed and unidentified class members or the NJDCA claims, although they undoubtedly arose, in large part, from acts of USCC prior to September 28, 1982, rose to the level of even contingent causes of action as of that date. *See In re M. Frenville Co.*, 744 F.2d 332, 334–38 (3d Cir. 1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). *But see, e.g., Grady v. A.H. Robins Co.*, 839 F.2d 198, 201 (4th Cir.1988).

However, the contingent claims of the named Plaintiffs in the Primary Action, the landlords, and the vendor of the copies were more than sufficient to constitute "existing debts" which exceeded the negligible saleable value of USCC's assets as of September 28, 1982. Therefore, we conclude that USCC was insolvent on that date.

■ The solvency of Rhode as of January 28, 1983, is an even easier issue to

426

resolve. Rhode had virtually one saleable asset, his automobile. However, its saleable value proved insufficient to liquidate his tax debts that were due and owing at the close of 1981 and 1982 and hence *were* deemable as obligations as of January, 1983, per *Edelson, supra,* 829 F.2d at 834. In addition, all of the obligations of USCC were clearly placed on his shoulders, as a guarantor and hence contingent debtor. He presented no evidence of any saleable assets over and above the vehicle. Clearly, then, Rhode was insolvent as of January 28, 1983.

5. Neither USCC nor Rhode received fair consideration for their respective transfers of their interests in the Premises.

■ The issue of fair consideration, which is addressed in N.J.S.A. 25:2–9, is also relatively easy to resolve on this record. Rhode alleges that the consideration for each transfer was repayment of antecedent debts. He alleges that Lorraine and he invested a total of $20,000.00 in the business, with more than half, although not clarifying how much more, being paid by Lorraine. The September conveyance is claimed to be a repayment to both Lorraine and him for this investment. The transfer to Lorraine is claimed, at least by the Defendants' counsel, to be a repayment of her share of the loan.

Subsection b of N.J.S.A. 25:2–9 does provide that an "antecedent debt in amount not disportionately small as compared with the value of the property ... obtained" may constitute "fair consideration" in connection with a fraudulent conveyance claim. However, the facts of this case as applied to the law do not support the assertions of the Defendants' counsel that fair consideration existed for either of the transfers here.

First, there is no hard evidence that any debt of USCC to Rhode and Lorraine, or certainly from Rhode to Lorraine arising out of the investments in this enterprise, even existed. The deeds recite no such consideration. There are no separate loan documents or even a scrap of written evidence supporting the existence of any bona fide loans.

Moreover, despite his more than natural tendency to recite the facts in a manner to best serve his interests, Rhode concedes that debt repayment was not the real motivating factor for either transfer. The September 28, 1982, conveyance was characterized as simply an undoing of the effort to capitalize USCC to commence a national franchising scheme. The January 28, 1983, transfer was described as an effort to engage in estate planning in the light of Rhode's premonitions of death.

Further, the alleged consideration in either transaction, even accepting the doubtful truth of Rhode's claims of debts, was hardly adequate. USCC paid $50,000.00 for the Premises, the value of which was very likely appreciating. In return, it repaid a $20,000.00 debt at a time when it was evident that the perceived gold mine in the franchising of the business nationally had totally evaporated. Rhode transferred his half-interest of at least $25,000.00 to Lorraine as repayment for her ill-fated payment of some figure in the neighborhood of $10,000.00. The alleged antecedent debts therefore seem to us disproportionately small when compared to the value of the interests in the Premises that were tranferred.

Finally, as particularly Finding of Fact 21, page 423 *supra,* indicates, we question Rhode's credibility generally. We simply do not believe that the allegations of antecedent debts are anything but expedient falsehoods. We quite agree with the Plaintiffs' contention that the payments by Rhode and Lorraine were not properly characterized as loans to be repaid, but rather as investments by which they hoped to build equity in USCC. *See Whitlock v. House,* 694 F.2d 861, 868 (1st Cir.1982); and *In re Atlas Foundry Co.,* 155 F.Supp. 615, 617–18 (D.N.J.1957). Moreover, Rhode and Lorraine did succeed in building equity in USCC, as they obtained their residence compliments of USCC even prior to the transfer of the Premises to them.

The transfer from Rhode to Lorraine, being an intra-spousal family transfer, raises even more skepticism. Rhode had produced not a scintilla of evidence to over-

come the "heavier burden" placed upon the parties to establish fair consideration in such a setting. *See, e.g., ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. 1388, 1391–92 (S.D.N.Y.1987); *Orbach v. Pappa,* 482 F.Supp. 117, 119–20 (S.D.N.Y.1979); *Sahley v. Tipton Co.,* 264 F.Supp. 653, 657 (D.Del.1967); and *Leventhal v. Spillman,* 234 F.Supp. 207, 212 (E.D.N.Y.1964).

It therefore appears to us that there was no consideration whatsoever for either transfer of the Premises, and that the recitation of lack of consideration in the Deeds was, in fact, accurate.

■ 6. The combination of insolvency of the transferors and absence of fair consideration in both of the respective transfers renders them both fraudulent without proof of actual intent. N.J.S.A. 25:2–10.

■ 7. The transfer of September 28, 1982, is also avoidable under N.J.S.A. 25:2–11, which provides that, when a party engaging in business leaves unreasonably small capital in his hands to do so after a transfer, the transfer is fraudulent.

It is not necessary to discuss any of the theories alternative to N.J.S.A. 25:2–10 presented by the Plaintiffs as to why the transactions in issue should be deemed voidable under the UFCA to reach our decision. Given Rhode's general lack of credibility, it is certainly conceivable that, if necessary, we could have found that subjective intent to defraud, per N.J.S.A. 25:2–13, was present. Certainly, the timing of the these conveyances is suspiciously close to the time when it should have been obvious to Rhode that not only was his brainchild an aborted attempt at large-scale success, but that he had conceived a monster

of potential liabilities which might wipe him out financially. The only factor which causes us to express a reluctance to find fraudulent intent stems from our observation that the Defendants could have easily orchestrated a far more effective device to defraud creditors, if that was their intent, by simply transferring the Premises from USCC to Lorraine in September, 1982. In any event, we make no finding, either way, as to whether the elements of N.J.S.A. 25:2–13 have been proven.[3]

However, we are quite certain that the transfer of September 28, 1982, represented a denuding of USCC such that it had "unreasonably small capital" such that we are prepared to make N.J.S.A. 25:2–11 an alternative holding for invalidation of this transfer as a fraudulent conveyance. We believe that Rhode, despite his tendency to twist and turn his testimony, practically admits this. Initially placing the Premises in USCC's name was, per Rhode, intended to create an asset sufficient to secure the financial backing necessary to produce his vision of a national franchising scheme. Taking the Premises out of USCC's name represented, again per Rhode himself, an abandonment of those hopes, and a prelude to abandonment of the business altogether. *Compare In re Checkmate Stereo & Electronics, Ltd.,* 9 B.R. 585, 613–14 (Bankr.E.D.N.Y.1981). Thus, grounds for invalidating this transfer under N.J.S.A. 25:2–11 exist as well.

8. The transfers of both September 28, 1982, and January 28, 1983, were fraudulent conveyances pursuant to the UFCA.

9. As creditors whose claims are neither matured nor liquidated, the unnamed class members are entitled to only an injunction

---

3. Most of the authorities cited by the Defendants in their Brief address only instances where actual, subjective fraud, pursuant to N.J.S.A. 25:2–13, was in issue rather than any of the "objective fraud" situations outlined in the UFCA, as, for example, in N.J.S.A. 25:2–10. It is in this context that the principle is articulated that, when the debt arises subsequent to the transfer, the creditor must prove actual fraudulent intent in order to set aside a fraudulent conveyance. *See In re Club Evergreen, Inc.,* 33 F.Supp. 536, 537–38 (D.N.J.1940); and *O'Neill v. Little,* 107 N.J.Super. 426, 432, 258 A.2d 731, 735

(1969). Futhermore, here, incurrence of the debt to at least the named Plaintiff did precede both transfers. It is only in the context of an unpleaded claim of actual fraud that the court in *Freitag v. Strand of Atlantic City,* 205 F.2d 778, 783 (3d Cir.1953), states that suspicions of fraud are not proof of same. The respective courts did not have before them, as here, proof of the elements of "objective fraud." *Compare Freitag, supra,* 205 F.2d at 783–85 (court fails to find lack of consideration necessary to invoke "objective fraud" sections of UFCA).

restraining the transfer of the Premises, pursuant to N.J.S.A. 25:2–16.

Although the named Plaintiff's judgment arguably renders his claim matured, it has clearly not been liquidated, and we are reluctant to grant the Plaintiffs any of the further, more drastic relief set forth in N.J.S.A. 25:2–15, i.e., allowing the Plaintiffs to disregard the conveyances and levy on the Premises or have the conveyances set aside unless and until the claim is liquidated. It is only then that a judgment creditor can execute upon a debtor's property. *Compare Lomonaco, supra,* 108 N.J.Super. at 87, 260 A.2d at 12–13 (creditor whose unliquidated rights are established entitled to have transfers set aside); and *People's Savings & Dime Bank & Trust Co. v. Scott,* 303 Pa. 294, 296, 154 A. 489, 490 (1931) (creditor with contingent liability entitled to have transfer set aside); *with South Camden Trust Co. v. Black,* 110 N.J.Eq. 97, 98–100, 159 A. 155, 156–57 (1932) (claim must be established in validity and amount before conveyance will be set aside).

Although we recognize that, at this point, this relief will not enhance the relief already granted in the order preventing the Defendants from alienating the property in the Primary Action on October 16, 1986, it does set the stage for the relief set forth in N.J.S.A. 25:2–15 if the claims of the named Plaintiff and the class members are liquidated in the Primary Action after trial on June 14, 1988.

## C. CONCLUSION

We will therefore issue an Order transmitting these Recommendations to the district court with a proposed Order granting the Plaintiffs much of the relief that they seek.