In re Henry GHERMAN, First Financial Planning Corporation of South Florida, Inc., Financial & Investment Planning, Inc. a/k/a FIP, Inc., Debtors.

Arthur G. SHAPIRO, M.D., et al., Plaintiffs,

v.

Henry GHERMAN, Joan Gherman, First Financial Planning Corporation of South Florida, Inc., Financial & Investment Planning, Inc. a/k/a FIP, Inc., Shari G. Rance, and Craig Gherman, Defendants.

James S. FELTMAN, as Trustee for Henry Gherman, First Financial Planning and Financial Planning & Investment, Inc. a/k/a FIP, Inc., Cross-claim and Third Party Plaintiff,

v.

Henry GHERMAN, Joan Gherman, First Financial Planning Corporation of South Florida, Inc., Financial & Investment Planning, Inc. a/k/a FIP, Inc., Shari G. Rance and Craig Gherman, Cross-claim and Third Party Defendants.

Bankruptcy No. 88–03266–BKC–TCB.
Adv. No. 88–0581–BKC–TCB–A.

United States Bankruptcy Court, S.D. Florida.

April 13, 1989.

Joel M. Aresty, Miami, Fla., for defendants, Henry Gherman, First Financial Planning Corp., Financial & Inv. Planning, Inc., FIP, Inc. and Pro–Med Services, Inc.

Thomas K. Equels, Holtzman, Krinzman & Equels, Coral Gables, Fla., Ronald G. Neiwirth, Miami, Fla., and William R. Amlong, Amlong & Amlong, P.A., Ft. Lauderdale, Fla., for defendants Joan Gherman, Shari Gherman and Craig Gherman.

James S. Feltman, Miami, Fla., Chapter 11 trustee.

Ronald R. Peterson, Jenner & Block, Chicago, Ill., John W. Kozyak, Miami, Fla., for Chapter 11 trustee.

Schantz, Schatzman, Aaronson & Berlin, P.A., Miami, Fla. and State Court Successor Receiver, Alec Wallace, Miami, Fla., for Chapter 11 Creditors' Committee.

Robert L. Koeppel and Mitchell K. Karpe, Miami, Fla., for Alec Wallace.

## MEMORANDUM DECISION

THOMAS C. BRITTON, Chief Judge.

In his criminal court plea agreement, the debtor/defendant Gherman has admitted embezzling at least $9.7 million from money he managed for about 100 investors.[1] The embezzlement occurred over at least a six-year period, from December 1982 to August 1988. It was discovered when Gherman fled to Taiwan on August 8 after withdrawing and secreting $4.4 million of the stolen money during the preceding month.

In this lawsuit the bankruptcy trustee asks denial of Gherman's discharge. He also seeks the recovery from Gherman's family of $5.6 million transferred to or for family members, and imposition of a constructive trust upon various assets bought with that money.

The identified assets include three homes, two apartments, equity in four limited partnerships and three corporations, 16 bank and brokerage accounts, two mortgages, seven automobiles, and two yachts.

The matter was tried on March 2. I now conclude that the trustee is entitled to the relief he seeks.

### The Pleadings

This action was filed August 10, 1988 in the State court by 20 of Gherman's clients. It sought a receiver, an accounting, and the recovery of misappropriated funds from Gherman and other defendants: two corporations through which he had conducted his business, Financial Planning and Investment, Inc. (FIP) and First Financial Planning, Inc. (FFP), Gherman's wife Joan, his daughter Shari and his son Craig. A receiver was appointed and, by mutual agreement, all assets were frozen pending fur-

---

1. This record shows that over $10 million has been embezzled.

ther order of the court. Nothing else has occurred in the case.

Eight days later plaintiffs filed in this court involuntary chapter 11 petitions against Gherman, FIP and FFP. At plaintiffs' request, the State court receiver became the bankruptcy trustee.[2] Orders for relief were entered without contest on September 23. Plaintiffs' original attorneys have since withdrawn and the trustee has retained bankruptcy specialists.

To avoid the confusion and expense of duplicative litigation in the two courts, the plaintiffs (under Rule 9027) removed the State action to this court on December 20.

At a hearing held January 26, 1989 this court resolved all pending motions and set the matter for trial on all contested issues. (CP 22 through 28, 40).

It was recognized at that hearing that the original complaint would be dismissed and replaced by the trustee's cross-claim and third party complaint. However, the State court action and that awkward format was retained in order to preserve, pendente lite, the status quo balance developed by the parties and the State court. (CP 40 at 8–9).

The original complaint has now been dismissed; therefore, for all practical purposes the trustee is the plaintiff and his cross-claim and third party complaint, as amended (CP 117, 122) is the complaint. By stipulation, the trustee's Count XII has been dismissed without prejudice. (CP 132). The defendants have answered. (CP 84 through 91).[3]

### The Essential Facts

*The Scam.* Gherman, an insurance agent, formed FIP in 1970 to provide comprehensive financial services to clients, principally doctors, who had bought insurance from him. Beginning no later than December 1982, he embarked (in his words) on a:

> "scheme to defraud investors ... out of approximately $9.7 million in pension and other funds ... by fraudulently representing to such investors that such funds had been placed in certificates of deposit, when, in truth and in fact, such investments were not made and such certificates of deposit did not exist." (Ex 3 at 2).

All of the embezzled funds were deposited in FIP's account and were converted to his use.

*Tracing the Converted Funds.* After Gherman's earlier 1969 bankruptcy, where he had been denied discharge, Gherman never held anything in his own name (other than as trustee). His specific purpose in doing so was to hinder, delay and defraud creditors to whom he then owed at least $100,000. He never deviated from this purpose and pattern.

FIP was also formed in 1970 to hinder, delay and defraud creditors. Its completely commingled account became Gherman's personal account for all purposes. Most of the stolen money was transferred from FIP to the accounts of his wife Joan and, both directly and through her, to the other members of his family: his son Craig, his daughter Shari, her husband Leslie, and their two children Ashtyn and Chasyn.

The defendants Justice For All, Inc. and Chaska Trading, Ltd., incorporated in, respectively, Florida and Antigua, each of which had a separate and active brokerage account were formed later by Gherman for

---

**2.** He has since resigned and been replaced as the State court receiver. As required by 11 U.S.C. § 543, all assets of the receivership are being administered by the bankruptcy trustee.

**3.** The family argues that the trustee is not a party to this action. (CP 130B at 21). Upon his appointment, the trustee became vested by statute with the causes of action asserted by plaintiffs and became the only person permitted to assert such actions. He was also vested with statutory federal remedies supplementing those previously asserted by the creditor plaintiffs.

He clearly had the right not only to be substituted as plaintiff but also to institute a second action, which could be consolidated for trial with the removed action.

The trustee's cross-claim and third party complaint accomplished both purposes without the duplication, confusion, delay and expense to all parties of separate litigation. Neither the family nor any other party has been prejudiced in any respect by the procedure followed in this case.

the same purpose, as mere instrumentalities to hide assets from his creditors.

In 1983, FFP was incorporated ostensibly to sell insurance, but actually (in Gherman's words):

"to establish a vehicle that would allow income to flow to my children ... So Shari and Craig formed a corporation, owned the stock and ... whatever income Shari did not take out over and above operating the company ended up being in distribution to the two kids." (Ex. 5 at 173–74).

FFP was a sham under Gherman's complete control, providing the same service to the same clientele from the same office by the same staff as FIP. Its primary function was to transfer and conceal stolen money. Like FIP, FFP's secondary function was to cheat its clients by overbilling insurance premiums, sometimes as much as 80%.

Viewed separately, most of the entities used by Gherman to transfer and conceal assets, were insolvent at all times material to this litigation. FFP was not. I agree, however, with the trustee that all of these entities, including FFP, were alter egos of Gherman and collectively they were insolvent at all relevant times.

The following amounts of embezzled funds have been traced to the following defendant family members:

| | |
|---|---|
| Joan Gherman | $3,590,160 |
| Craig Gherman | 608,533 |
| Shari Gherman–Rance | 1,205,120 |
| S. Chasyn John Rance | 163,026 |
| Ashtyn Michael Rance | 40,424 |
| | $5,607,263 |

The only consideration claimed for any of these transfers has been minor personal services provided by Joan, Craig and Shari. Each worked with and for Gherman and the entities dominated by him. Each was a corporate officer of one or more of those entities at all relevant times.[4] However, the salaries paid to these relatives bore no relationship to and were far in excess of the value, if any, of those services.

No family member had any qualification for or experience in providing the services furnished by Gherman through his corporations. The value of the time spent by each, if it had any value at all, was nominal. Because the family members, as corporate officers, were fiduciaries of the corporations that paid them, it is their burden to justify any part of the salaries they drew. I find that they have failed to carry that burden.

If the family members were, as each professes, completely unaware of their father's massive six-year fraud conducted through the corporations each served as an officer, the family members were either officers in name only or were so incredibly incompetent and derelict in their duties as to have forfeited any compensation as fiduciaries.

If, as is more plausible, they were aware of the fraud, they have forfeited compensation for that reason. For the purposes of this action, it is irrelevant whether the individual family members were knowing participants in Gherman's fraud or were ignorant and incompetent corporate officers.[5] Each was one or the other.

*The Exit Money.* In July and August of 1988, Gherman left Miami with suitcases containing $4.4 million of funds he had embezzled. He did so intending to conceal that money from his creditors and hide himself from criminal prosecution. Some of those funds have been accounted for and some more has been located and recovered by the trustee through litigation, but over $1 million remains unaccounted for and untraced.

I do not believe and cannot accept Gherman's completely undocumented explanation that he lost the embezzled funds, some of which remain unaccounted for, in the stock market.

*The Identified Assets.* In this action, the trustee has traced a part of the stolen

---

4. Although Joan purportedly severed her connection with FIP in 1984, I find she did not do so and remains an officer and director. (Group Ex. 26).

5. For this reason, I make no finding on that issue.

funds, through members of the family, to certain assets, owned by one or more family members. These assets have been characterized above and are specifically identified in the record. No purpose would be served by repeating that identification here.

In each instance, the present ownership was obtained without consideration [6] and in no instance has the present owner carried his or her burden of establishing any basis for a lien against the property under § 550(d).

*Discovery Of The Fraud.* The facts giving rise to the causes of action asserted here by the trustee were not discovered until August 8, 1988, when Gherman fled the country and went into hiding leaving a written confession. The defendant family members have argued that with the exercise of due diligence, the creditors should have discovered the fraud years ago. I do not agree.

If the defendant family members are to be believed, not even they were aware of the fraud. It is also significant that not one of the clients discovered Gherman's fraud before he revealed it. His explanations and precautions (he even mailed fictitious 1099 reports to his dupes), fooled 20 sophisticated physician/clients as well as CPAs who audited their records. *See Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996, 1002 (5th Cir.1974), *cert. denied sub nom., Economic Research Analysts, Inc. v. O'Connell,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975).

### Legal Conclusions

■ *Disregard of Corporate Entities.* Under Florida law, the separate identity of a corporation will be disregarded on proof that it is a "mere instrumentality" of, that is to say, it is completely dominated by, another corporation or individual, and that it is a device or sham to mislead creditors or exists for some other fraudulent purpose. *Bendix Home Systems, Inc. v. Hurston Enterprises, Inc.,* 566 F.2d 1039 (5th Cir.1978).

Because FIP, FFP, Justice For All and Chaska Trading were all formed by and dominated by Gherman as mere instrumentalities to hinder, delay or defraud his creditors or to conceal money he had embezzled, the separate corporate identity of each must be disregarded in this case. Each is an alter ego of Gherman.

■ *Discharge.* Discharge is denied to a debtor who:

"with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, ... or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." § 727(a)(2).

Gherman has repeatedly transgressed every provision of this subsection and continues to do so.

■ Discharge is also denied a debtor who:

"has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." § 727(a)(5).

Gherman's discharge must also be denied on this account.

■ He has argued here that because this is a chapter 11 case, the provisions of § 727 are not applicable to him. I disagree. *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 874 (8th Cir.1988) (chapter 11 debtor's discharge denied under § 727(a)(2)(A)). The court said:

"[a]lthough Tveten filed for bankruptcy under Chapter 11, the proscription against discharging a debtor with fraudulent intent in a Chapter 7 proceeding is equally applicable against a debtor applying for a Chapter 11 discharge. The reason for this is that the Code provides that confirmation of a plan does not discharge a Chapter 11 debtor if 'the debtor would be denied a discharge under sec-

---

**6.** For example, a 1985 Chris–Craft was purchased in June 1985 with a $35,142 FIP check and is owned by Shari. The boat is named "Thanks Mom—Thanks Dad."

tion 727(a) of this title if the case were a case under Chapter 7 of this title.' 11 U.S.C. § 1141(d)(3)(C) (1982)."

■ Gherman has also argued that he is entitled to a discharge because the money he fraudulently transferred and concealed was stolen and, therefore, neither "property of the debtor" nor "property of the estate".[7] I refuse to read § 727(a)(2) so literally as to deny discharge to an honest debtor while granting discharge to a thief. *United States v. Ron Pair Enterprises, Inc.,* — U.S. —, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (citing *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)).

In any event, the debtor's argument collapses if the separate identity of FIP is disregarded and it is recognized as Gherman's alter ego. All of the fraudulently transferred and concealed money came from FIP. FIP, Gherman's alter ego, clearly had both the legal title to and possession of that money.

*Fraudulent Transfers Under § 548(a).* A bankruptcy trustee may avoid fraudulent transfers *made within the year preceding bankruptcy* (i.e. in this case after August 8, 1987), if they were made with an actual intent to hinder, delay, or defraud creditors, or if the debtor was then insolvent and received less than a reasonably equivalent value. § 548(a).

The trustee has proved by both standards fraudulent transfers, avoidable under § 548(a), in the following amounts made during the year preceding bankruptcy to the following family members: [8]

| | |
|---|---|
| Henry Gherman | $ 511,441 |
| Joan Gherman | 1,179,114 |
| Henry and Joan Gherman, jointly and severally | 12,278 |
| Shari Gherman Rance | 516,160 |
| Craig Gherman | 214,989 |
| Chasyn John Rance Trust | 674 |

**7.** Post-trial Memorandum (CP 130 at 4): "It was other people's money, but it was not proved to be property of the debtors or of the estate of the debtors, a requirement of proof under Section 727(a)(2)".

**8.** Ex. 120 through 124.

| | |
|---|---|
| Leslie Rance | $ 71,660 |
| | $2,506,316 |

*Fraudulent Transfers Under § 544(b).* A bankruptcy trustee may also avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim allowable under § 502. § 544(b). This provision is significant, because it reaches transfers which occurred *more than a year before bankruptcy.*

The applicable law is the Florida Uniform Fraudulent Transfer Act, *Fla.Stat.* § 726.105(1)(a), effective January 1, 1988. Its departures from its Florida predecessor, *Fla.Stat.* § 726.105(1)(b), do not appear to be material to any issue in this case.

■ Although its applicability to transfers which occurred before its effective date remains debatable, I conclude that the present Florida Uniform Act is remedial and should, therefore, be applied retroactively. 49 *Fla.Jur.2d,* Statutes § 108; *Orlando v. Desjardins,* 493 So.2d 1027 (Fla. 1986) (Public Records Act applied retrospectively); *In re Aloma Square, Inc.* 85 B.R. 623, 625 (Bankr.M.D.Fla.1988) (assignment of rents statute applied retrospectively).[9]

I reject defendants' contention that the replacement of the former statute by the Uniform Act was intended to leave a void. If it be necessary, the trustee's post-trial motion to amend its pleadings to make reference to the former statute is granted.

The trustee has proved fraudulent transfers (in addition to those identified above as avoidable under § 548(a)), which are avoidable under § 544(b) and *Fla.Stat.* § 726.105(1)(a), in the following amounts to the following family members: [10]

| | |
|---|---|
| Henry Gherman | $2,136,519 |
| Joan Gherman | $2,411,047 |
| Shari Gherman Rance | 688,959 |
| Craig Gherman | 393,543 |
| Chasyn John Rance Trust | 162,352 |

**9.** I must recede from a contrary conclusion expressed as dicta in *In re Mart,* 88 B.R. 436, 438 n. 1 (Bankr.S.D.Fla.1988).

**10.** Ex. 120 through 124.

| | |
|---|---|
| Ashtyn Rance | $40,424 |
| Leslie Rance | 311,267 |
| Chasyn and Ashtyn Rance * | 186 |
| Henry and Joan Gherman * | 4,718 |
| Henry, Joan & Craig * | 2,714 |
| Henry, Joan & Leslie * | 2,945 |
| Henry, Joan, Shari & Leslie * | 180 |
| Joan & Shari * | 1,300 |
| Joan, Craig & Shari * | 1,000 |
| Shari & Craig * | 74 |
| Chasyn & Shari * | 307 |
| Shari & Leslie * | 26,384 |
| Shari, Leslie & Craig * | 35,440 |
| | $6,219,359 |

* Jointly and severally liable.

*Jury Trial.* Gherman, Justice for All, and Chaska have demanded a jury trial on all issues. That demand has been refused. *In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1348–50 (11th Cir.1988), *cert. granted sub nom.*, *Granfinanciera, S.A. v. Nordberg*, — U.S. —, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988).

■ *Statute of Limitations.* The Uniform Act provides that:

"A cause of action with respect to a fraudulent transfer ... under [this act] is extinguished unless action is brought ... within 4 years after the transfer was made ... or, *if later*, within 1 year after the transfer ... was or could reasonably have been discovered by the claimant." § 726.110(1).[11] (Emphasis added).

I conclude that the statute of limitations has not expired on any cause of action asserted here by the trustee under § 544(b). It will not expire until August 8, 1992.

*Trustee's Standing.* As has been noted, the trustee's causes of action under § 544(b) require proof that at least one of the present creditors of the estate, holding an allowable claim, was an actual unsecured creditor against whom the transfer was fraudulent and voidable under the applicable state law. 4 *Collier on Bankruptcy* (15th Ed.1988) ¶ 544.03[1] n. 24. The trustee has done so. Dr. Michaelson is one

such creditor with standing to challenge under § 544(b) each of the transfers at issue in this case. There are many others listed in the debtors' Schedule A–3.

*Constructive Trust.* With reference to the specific assets owned by one or more family members, but purchased with stolen funds, the trustee seeks imposition of a constructive trust in favor of the estate upon each asset.

■ Imposition of a constructive trust is justified to prevent unjust enrichment where misappropriated funds have been traced to specific assets owned or held by a third party, who is not a bona fide purchaser for value. *In re General Coffee Corporation*, 828 F.2d 699 (11th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988). The trustee has established this predicate with respect to each of the specific assets targeted in this action.[12]

*Homestead Exemption.* Part of the stolen funds was used to purchase three homes: a house at 3342 N.E. 171st Street, North Miami Beach, Joan's residence, and Gherman's before he fled the country; another house at 20201 N.E. 23rd Court, North Miami Beach, the Rance residence; and a condominium in North Miami Beach, Craig's residence.

■ Defendants have contended, as an affirmative defense, that the Florida homestead exemption, *Fla. Const.* Art. X, § 4, insulates these residences from the constructive trust asserted by the trustee. It does not.

As was said in *Mansell v. Carroll*, 379 F.2d 682, 685 (10th Cir.1967) (affirming trustee's judgment avoiding the fraudulent transfer of property against contention that the homestead exemption insulated the property from the trustee's action):

"The homestead exemption is for the benefit of the family and the protection

**11.** If the previous Florida statute is applicable, the applicable statute of limitation is not materially different for the purposes of this case. §§ 95.031(2), 95.11(3)(j).

**12.** In *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), the Court said that

creditors defrauded by Charles Ponzi can follow their money wherever they can trace it, and assert possession of it on the ground that there was a *resulting trust* in their favor. Under the circumstances of this case, imposition of either a constructive or a resulting trust is necessary to effect the statutory remedy provided by § 550.

of the family home. It was never intended as a device to effectuate frauds and a court of equity should not countenance any wrongful use of the homestead right."

■ *Interest and Costs.* The trustee seeks prejudgment interest. Under the circumstances of this case, he is entitled prejudgment interest from the date of his first formal demand, January 26, 1989 (the date of the cross-claim and third party complaint) at the rate specified by 28 U.S.C. § 1961. *Palmer v. Radio Corporation of America,* 453 F.2d 1133, 1140 (5th Cir. 1971). Therefore, the judgment entered in this proceeding shall bear interest from January 26, 1989 at the rate of 9.51%.

Costs may be taxed on motion.

### Conclusion

As is required by B.R. 9021, a separate judgment will be entered in accordance with the foregoing findings and conclusions. The trustee is directed to submit the appropriate judgment.

DONE and ORDERED.