**In re Louis FLEET, Debtor.**

**Louis FLEET, on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**John J. RHODE a/k/a Jack Rhode, Lorraine Rhode, and United States Consumer Council, Inc., Defendants.**

Misc. No. 90–464.

Bankruptcy No. 81–04969S.

Adv. No. 87–0394S.

United States District Court, E.D. Pennsylvania.

Dec. 10, 1990.

911

Henry J. Sommer; and Gary Klein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Barry J. Hockfield and Wayne Powell, Cherry Hill, N.J., for defendant John J. Rhode and USCC.

Lawrence T. Phelan, Philadelphia, Pa., Receiver.

R. Alan Aslaksen, Audubon, N.J., for defendant Lorraine Rhode.

Edward Sparkman, Philadelphia, Pa., standing Chapter 13 Trustee.

## ORDER

FULLAM, District Judge.

AND NOW, this 10th day of December, 1990, it is hereby ORDERED AND DECREED as follows:

1. The Report and Recommendations of Bankruptcy Judge of July 11, 1990, are ADOPTED;

2. The Motion of Lorraine Rhode for an Order Determining the Value of her Premises and Other Relief is GRANTED in part. It is determined that she has no interest in the property. Therefore, her request for "other relief" is DENIED.

3. The Motion of the Plaintiffs for Further Relief with Respect to Rents and Proceeds of Fraudulently Transferred Property is DENIED.

## REPORT AND RECOMMENDATIONS OF BANKRUPTCY JUDGE

DAVID A. SCHOLL, Bankruptcy Judge.

### A. *Introduction*

Some cases never seem to end. Witness the case(s) arising from a class action by a debtor, LOUIS FLEET, and others (herein "the Plaintiffs"), attacking the practices of Defendant UNITED STATES CONSUMER COUNCIL, INC. ("USCC"), and its principal, Defendant JOHN J. (JACK) RHODE

("Rhode"), which began with the filing of Adversary No. 83–0880S on March 31, *1983.* In this latest and hopefully near-to-last chapter of this case, we conclude that the Plaintiff judgment creditors, who were granted limited relief from certain fraudulent conveyances of USCC and Rhode pending liquidation of their claims, must obtain a final judgment in the instant proceeding before proceeding to liquidation. We conclude that the appointment of a receiver, clearly an intermediate remedy under the controlling (but subsequently repealed) New Jersey Uniform Fraudulent Conveyance Act, N.J.S.A. 25:2–1, et seq. ("the UFCA"), does not alter this requirement. We also hold that the attempts of Rhode's wife, LORRAINE RHODE ("Lorraine") (collectively Rhode and Lorraine are referred to as "the Rhodes"), to cling to some interest in the Premises, and the counterattempts of the Plaintiffs to belatedly charge the Defendants additional sums for imputed "rents and profits" in reference to the Premises, must both fail. Thus, although we resolve all issues of dispute on the horizon, our Recommendations promise that this case will live on for at least one further proceeding.

*B. Procedural History*

The merits of Adversary No. 83–0880S were finally resolved by the entry of a judgment totaling over $236,000 in favor of 281 consumers in two Recommendations approved by the district court and reported together as *In re Fleet,* 103 B.R. 578 (Bankr.E.D.Pa.) (*"Fleet VI"*). The *Fleet VI* designation is utilized because this decision was preceded by other related decisions reported at *In re Fleet,* 95 B.R. 319 (E.D.Pa.1989) (*"Fleet V"*); *In re Fleet,* 89 B.R. 420 (E.D.Pa.1988) (*"Fleet IV"*); *In re Fleet,* 76 B.R. 1001 (Bankr.E.D.Pa.1987) (*"Fleet III"*); *Fleet v. United States Consumer Council, Inc.,* 70 B.R. 845 (E.D.Pa. 1987) (*"Fleet II"*); and *In re Fleet,* 53 B.R. 833 (Bankr.E.D.Pa.1985) (*"Fleet I"*).

The instant matters before us arise out of a class action separate from Adversary No. 83–0880S, designated as Adversary No. 87–0394S, which was filed by the Plaintiffs on April 28, 1987, seeking to set aside certain transfers of the home of the Rhodes located at 446 Pricketts Mill Road, Tabernacle, New Jersey ("the Premises"). In *Fleet IV, supra,* the district court, on July 7, 1988, approved our Recommendation that conveyances of the Premises by USCC, in whose name the Premises was purchased on June 30, 1982, to the Rhodes on September 28, 1982, and from Rhode and Lorraine to Lorraine alone on January 28, 1983, should both be set aside as fraudulent conveyances. The *Fleet IV* Order was, however, not final because the judgment against USCC and Rhode in Adversary No. 83–0880S was not liquidated until the conclusion of *Fleet VI* over a year later. In the Order of July 7, 1988, we therefore merely enjoined Lorraine from disposing of the Premises "pending maturity and liquidation of the Plaintiffs' claims." 89 B.R. at 421.

Despite the completion of the liquidation process in *Fleet VI* on July 14, 1989, the Plaintiffs did not return to the instant proceeding to make any filings until January 18, 1990, when they sought the appointment of a receiver, allegedly pursuant to the New Jersey Uniform Fraudulent Transfer Act, N.J.S.A. 25:2–20 *et seq.* ("the UFTA"), particularly N.J.S.A. 25:2–29a(3)(b) thereof. No opposition having been raised, we appointed a receiver and executed an Order of February 13, 1990, which required the Rhodes to cooperate with the receiver in selling the property and further provided that, in lieu of rent, Rhode was obliged to make all payments necessary to prevent waste to the Premises.

However, shortly after the Plaintiffs filed a further motion to require the Rhodes to cooperate with the receiver or face eviction, Lorraine filed, on March 30, 1990, what she termed a Motion for an Order Determining the Value of [the Premises] and Other Relief (hereinafter "Lorraine's Motion"), which amounted to a claim that credits to which she was allegedly entitled, as a result of her financial contributions to the Premises, consumed all or most of the Plaintiffs' claims against the Premises. At her request, Lorraine's Motion was listed for an expedited hearing on April 5, 1990, with the motion referenced at the beginning of this paragraph.

After a colloquy with counsel on April 5, 1990, we scheduled a full hearing on Lorraine's Motion on May 3, 1990, giving the parties an opportunity to brief the perceived issues beforehand by April 27, 1990. After the hearing, we allowed the parties to submit further Briefs, ultimately completed by May 29, 1990.

However, on June 1, 1990, presumably as an afterthought engendered by research on Lorraine's Motion, the Plaintiffs filed a Motion for Further Relief with Respect to Rents and Proceeds of Fraudulently Transferred Property (hereinafter "the Plaintiffs' Motion") against the Rhodes, which was ultimately listed for a hearing on July 10, 1990.

### C. Pertinent Facts

Two witnesses testified at the hearing on May 3, 1990: Lorraine herself and Lee Cohen, an expert witness called by the. Plaintiffs to evaluate the fair rental value of the Premises. Lorraine testified that she alone had made all of the payments towards the purchase-money mortgage, taxes, insurance, and repairs and maintenance of the Premises from the date of USCC's purchase of the Premises to the present. The purchase-money mortgage, dated May 7, 1982, required payments, after a down payment on the $198,000 purchase price, of $138,000, in monthly installments of $1,150, without added interest, through December 1, 1988, at which time all sums due were to be liquidated with a balloon payment. Lorraine presented records of her checking accounts which indicated payments on taxes, insurance, and certain house repairs, although some of the tax bills were commingled with tax payments on an adjoining lot which is also titled to her. The mortgage payments were allegedly reflected by checks drawn to Rhode (without notation), which Rhode allegedly used in turn to pay on the mortgage. When only a few checks indicating utility payments appeared in her checking-account records, Lorraine suddenly "remembered" that she paid many of these bills with money orders instead of checks.

Lorraine claimed that she funded these expenditures with her independent income

from steady employment as a nurse, which totaled $14,799 in 1983; rose to $19,428 in 1984; remained in the mid-$20,000 range through 1988; and increased to $34,048,50 in 1989. In response to the court's inquiry as to why title to the Premises was taken in the name of USCC and why the conveyances found by us to have been fraudulent of September 28, 1982, and January 29, 1983, were made as they were, Lorraine stated that these decisions were made solely by her husband, were not questioned by her, and hence the reasons were unknown to her.

We cannot credit much of this testimony, particularly the allegation that Lorraine herself paid all of the expenses connected with the Premises, for several reasons. Firstly, the division of financial responsibilities described by Lorraine is most unlikely, given her rather modest income and no indication of the income of Rhode over this period.

Secondly, although the Rhodes clearly had the ability to structure these transactions and payments thereon however they wished and had exclusive and full access to the means of proof of how same were actually accomplished, the documentation establishing how these payments were actually allocated between the Rhodes is extremely poor or absent. Particularly incredible is the contention that the process for making the mortgage payments was for Lorraine to make payments of same to Rhode, who in turn used her funds to pay the mortgage. Spouses are unlikely to delegate a payment of a financial responsibility which would normally be joint to one of them. It is even more unlikely that one spouse would draw a check to the other who would make the payment rather than the payor-spouse simply making the payment directly. We also discredit the obviously-contrived allegation that Lorraine paid the utility bills with money orders. People with checking accounts are unlikely to increase their costs with the added expense of buying money orders.

Thirdly, as the Plaintiffs point out in their post-trial Brief, Lorraine's alleged expenditures on the Premises in 1985 would have exceeded her income. It is highly unlikely that she devoted all of the funds

which she earned towards maintenance of the Premises.

We find that, in fact, although the Premises was, after January 28, 1983, titled solely to Lorraine, the parties continued to view expenditures related to their joint residence as joint obligations which they pooled their resources to pay. We also find that, by delegating authority for deciding how the Premises should be titled and what form the transfers should take to Rhode, Lorraine has not insulated herself from culpability for the fraud perpetrated thereby. *See In re Paolino*, 75 B.R. 641, 644–50 (Bankr.E.D.Pa.1987) (fraud of husband may be imputed to wife who delegated responsibilities to husband).

Cohen provided testimony supporting his conclusion that the fair rental value of the Premises is $3,251 monthly at present. With unquestionable credentials, Cohen accurately employed a discounted cash flow analysis in reaching this result. However, Cohen also conceded that the Premises is not located in an area where homes are generally rented and that there is no demand or market for the leasing of this property in its rural setting. He did indicate that far more modest townhouses in the area were bringing rents of up to $1,500 monthly. He also presented pictures which verify that the dwelling is very large, modern, and quite luxurious, and he estimated its value at $325,000 to $345,000 on the market despite its rural location.

On July 10, 1990, both parties rested on the factual record made at the May 3, 1990, hearing. We engaged counsel in argument in which we tested our some of the conclusions expressed herein, and found same unshaken.

### D. Discussion

1.  SINCE THE INSTANT MOTIONS RESULT IN A FINAL DETERMINATION CONCERNING THE RIGHTS OF THE PARTIES IN THE SUBJECT PREMISES, WE WILL TREAT THE MATTERS AS NON-CORE, RELATED MATTERS.

■ All of the *Fleet* decisions except for the denial of the Defendants' motion to dismiss Adversary No. 83–0880S in *Fleet I*

and the rulings on the class issue in *Fleet III* have been adjudicated as non-core, related proceedings. Moreover, in *Fleet I*, that proceeding, to which this one is related, was expressly designated as non-core. 53 B.R. at 838–40. Particularly pertinent is our treatment of the adjudication in this same adversary proceeding as non-core in *Fleet IV*. *See* 89 B.R. at 424.

In *Fleet VI*, 103 B.R. at 587 n. 1, we acknowledged that certain interlocutory matters, in which orders would not be appealable to the district court without leave of that court, *see* 28 U.S.C. § 158(a), could be decided by a bankruptcy court in non-core proceedings without use of the procedure established in B.Rule 9033. However, we utilized the B.Rule 9033 process in deciding the matters before us in *Fleet VI* because, even though the matters in issue there, particularly the Recommendations of May 17, 1989, were technically interlocutory, we were determining the rights of movants, there the Plaintiffs, with finality. *See id.*

Similarly, here, although the matters at issue are technically interlocutory, because further filings are expressly deemed by us to be necessary to complete this proceeding, final determinations of the rights of the Plaintiffs vis-a-vis Lorraine are in issue. Therefore, in the absence of express and unanimous consent by the parties to do otherwise, *see* 28 U.S.C. § 157(c)(2); and B.Rule 7012(b), which has not been forthcoming, we are obliged to refrain from entering a final order and will utilize the B.Rule 9033 process here.

2.  THE COURT'S APPOINTMENT OF A RECEIVER, BEING CLEARLY AN INTERLOCUTORY REMEDY UNDER THE APPLICABLE UFCA, WAS NOT A FINAL DETERMINATION OF LORRAINE'S LACK OF RIGHTS IN THE PREMISES.

a.  THE TRANSFERS IN ISSUE ARE GOVERNED SOLELY BY THE REPEALED UFCA, NOT BY THE SUBSEQUENTLY ENACTED UFTA.

■ The Plaintiffs attempt to short-circuit Lorraine's Motion by arguing that the

unopposed appointment of a receiver on their motion on February 13, 1990, was a final determination that the entire Premises would be sold as to all interested parties, foreclosing Lorraine from arguing that she has any interest in the Premises under principles of *res judicata* or the "law of the case" doctrine. This contention is based, in part, upon the contention that the motion for appointment of the receiver was properly made under N.J.S.A. 25:2–29a(3)(b) of the UFTA, which repealed and replaced the UFCA in New Jersey, effective January 1, 1989. *See* N.J.S.A. 25:2–34.

However, we disagree with the Plaintiffs' contention that the UFTA applies, in any sense, to this transaction. The normative rule regarding the effect of statutes is that they are applied prospectively only. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno,* ––– U.S. –––, 110 S.Ct. 1570, 1576–77, 108 L.Ed.2d 842 (1990); *United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982); and *In re Perkins,* 106 B.R. 863, 871–72 (Bankr.E.D.Pa.1989), *aff'd,* C.A. No. 89–8705 (E.D.Pa. Feb. 1, 1990).[1]

Following this general principle, the New Jersey Supreme Court, in *Gibbons v. Gibbons,* 86 N.J. 515, 521–25, 432 A.2d 80, 83–84 (1981), articulated the following generally recognized situations in which courts have made exceptions to the rule that statutes are applied prospectively only: (1) The statute expressly states that it shall apply retroactively; (2) the statute is purely ameliorative or curative; and (3) the expectations of the parties warrant retroactive application. Clearly, the first alternative is inapplicable; the New Jersey UFTA is silent regarding retroactive application.

The second alternative also appears rather clearly inapplicable, because the UFTA overhauled the UFCA in numerous substantive aspects. The Plaintiffs argue that the issue here deals with the Plaintiffs' remedies, and that therefore the statutory enactment of the UFTA, as applied to the instant facts, is merely ameliory. However, this analysis is misplaced, because the focus must be upon the *entire* statute the retroactive effect of which is in issue, not upon the particular aspect of that statute relevant to a matter at hand regarding its interpretation.

Finally, the parties could have hardly expected that this case would be decided under the UFTA. The substantive decision reflected in *Fleet IV* was made under the UFCA. 89 B.R. at 424–28. We specifically tailored our recommended order in *Fleet IV* to conclusions reached after our discussion of the UFCA's remedial provisions. *Id.* at 427–28. Not only would it be unexpected, but also it would be grossly unfair, to all parties concerned to switch horses now and, having applied the substantive law of the UFCA, turn suddenly to the remedial provisions of the UFTA to enforce the violations of that substantive law.

We have located no New Jersey case addressing whether the enactment of the UFTA should be deemed retroactive or prospective only. However, with the exception of a conclusory holding by the court in *In re Gherman,* 103 B.R. 326, 331 (Bankr. S.D.Fla.1989), contrary to holdings of two other bankruptcy judges in the same state, *see In re Smith,* 110 B.R. 597, 598–99 (Bankr.M.D.Fla.1990); and *In re Warner,* 83 B.R. 807, 809–10 (Bankr.M.D.Fla.1988), the courts of every jurisdiction which has considered the question have concluded that the replacement of the UFCA by the UFTA is to be accorded prospective effect only, *i.e.,* the UFTA is applied only to alleged fraudulent transfers occurring after the effective date of the UFTA in that jurisdiction. *See In re Martin,* 113 B.R. 949, 957 (Bankr.N.D.Ill.1990); *Blankenship v. Myers,* 97 Idaho 356, 544 P.2d 314, 324 (1975); and *Vinlis Construction Co. v. Roreck,* 67 Misc.2d 942, 325 N.Y.S.2d 457, 460–61 (Nassau Co. Sup.Ct.1971). Moreover, the *Gherman* court, apparently unaware of the *Warner* decision, cites another decision by the judge who decided *Warner,* Judge Proctor, in its support, *In re Aloma Square, Inc.,* 85 B.R. 623, 625 (Bankr.M.D.Fla.1988). The result in *Alo-*

---

**1.** The Third Circuit Court of Appeals summarily affirmed a decision on all fours with *Perkins* in a matter referenced as *Appeal of Mid–Penn Con-* *sumer Discount Co.,* 891 F.2d 282 (3d Cir.1989). *See In re Milbourne,* 108 B.R. 522, 530 (Bankr.E.D.Pa.1989).

*ma Square,* unlike *Warner,* does not involve the UFTA, and we ourselves, as well as at least one other court, have questioned whether *Aloma Square* was correctly decided. *See In re Franklin Pembroke Venture II,* 105 B.R. 276, 279–80 (Bankr.E.D. Pa.1989).

It is therefore plain to us that all aspects of the transfers in issue, including the instant motions, must be decided under the UFCA.

b. THE APPOINTMENT OF A RECEIVER IS A REMEDY TO BE EXCLUSIVELY EMPLOYED PRIOR TO THE MATURITY OF A CLAIM UNDER THE UFCA.

■ Under the UFCA, one of the remedies available to creditors *whose claims have not matured,* N.J.S.A. 25:2–16, is

the appointment of a receiver to take charge of the property affected by such conveyance or of such obligation until such creditor's claim shall mature and shall be either established according to law or be made a lien upon such property or obligation, ...

Nowhere in N.J.S.A. 25:2–15, which relates to rights of creditors whose claims *have* matured, is the appointment of a receiver mentioned as a potential remedy.

This result is not surprising. The appointment of a receiver generally is an "ancillary, incidental, and provisional remedy," *Globe Solvents, Inc. v. Nouskhajian,* 148 Pa.Super. 202, 209, 24 A.2d 687, 690 (1942), that is " 'only a means to reach some legitimate end sought through exercise of the power of a court of equity,' " *Orshefsky v. Mechanics Trust Co.,* 120 N.J.Eq. 527, 530, 187 A. 779, 781 (1936), quoting *Gordon v. Washington,* 295 U.S. 30, 37, 55 S.Ct. 584, 588, 79 L.Ed. 1282 (1935).

■ In speaking of § 7 of the UFTA, codified at N.J.S.A. 25:2–29, the Official Comment explains that

[a]s under the Uniform Fraudulent Conveyance Act, a creditor is not required to obtain a judgment against the debtor-transferor or to have a matured claim in order to proceed under subsection (a)

[which includes the appointment of a receiver].

7A UNIFORM LAWS ANN. 661 (1985). Therefore, even if we would be inclined to apply the UFTA to determine the appropriate means for the Plaintiffs to remedy the fraudulent transfers in issue, we would be disinclined to find that the appointment of a receiver was in any sense indicative of or comparable to the entry of a final judgment in this proceeding.

We continue to advise the Plaintiffs, as we did prior to entering the Order of February 13, 1990, and at the hearings on April 5, 1990, May 3, 1990, and July 10, 1990, that they are obliged to obtain a final judgment against all defendants in this proceeding, including Lorraine, before they may proceed to liquidate the Premises. The Recommendation in *Fleet IV* so provided. 89 B.R. at 427–28. The controlling UFCA so provides. N.J.S.A. 25:2–15. The UFTA, assuming it were applicable, does not suggest to the contrary.

In light of the Plaintiffs' refusal to heed our suggestion to proceed to a final judgment in this matter, we are compelled to *sua sponte* schedule a final trial in this matter, after which such a final judgment may be entered. We are most anxious to bring a matter which has lingered so long on our dockets to a prompt conclusion.

In no sense could our Order of February 13, 1990, be considered "the law of the case" regarding Lorraine's lack of rights to the Premises. The appointment of a receiver is not a final remedy, so that appointment was merely another indication that final relief had not been entered. If the law of the case is in any sense applicable here, it dictates that the Plaintiffs should adhere to the contents of our Recommendation in *Fleet IV,* and bring their claims up to maturity before proceeding with any sale of the Premises. *Res judicata,* which pertains to the impact of *previous* adjudications upon a particular matter under litigation, *see, e.g., In re Laubach,* 77 B.R. 483, 485 (Bankr.E.D.Pa.1987), is patently inapplicable.

We must therefore proceed to consider the cross-motions before us on their merits.

3. WHATEVER CREDITS LORRAINE RHODE IS ENTITLED TO MUST BE OFFSET BY HER LIABILITY FOR IMPUTED RENT FOR USE OF THE PROPERTY, THEREBY ENTITLING THE PLAINTIFFS TO SELL THE PREMISES WITHOUT ALLOWING HER ANY CREDIT, BUT NOT PERMITTING THEM TO ENHANCE THEIR RECOVERY BY A BELATED CLAIM FOR IMPUTED RENTS.

We finally reach the merits of the Motions before us. We begin by observing that several considerations weigh heavily against Lorraine's claims that she receive, against the Plaintiffs' claim, full credits for all of her alleged payments towards the Premises. Firstly, her recitation of the facts, per our findings recited on pages 913–914 *supra*, are incredible. As she admitted, the entire strategy of the titling of the Premises was conceived by her husband. We note that, in *Fleet IV*, we did not find subjective intent on the part of Rhode to defraud the Plaintiffs, but stated that, if necessary, we conceivably could have so found. 89 B.R. at 427. Moreover, given his admitted role as the strategist for how the Premises was titled, it is doubtful that Rhode would hand over the responsibility for the payments of all liabilities arising in connection with the Premises to Lorraine, whose business acumen was considerably less well-developed than his. We note that we have frequently found Rhode to be a witness prone to make expedient exculpatory declarations and hence lacking in credibility. *See Fleet V*, 95 B.R. at 329; *Fleet IV*, 89 B.R. at 426; and *Fleet II*, 70 B.R. at 849.

Rhode's hand lies heavily on the Motions before us. As Lorraine was forced to admit, Rhode hired Lorraine's instant counsel, obviously to represent his as well as Lorraine's interests. We believe that Rhode almost certainly has orchestrated Lorraine's claims to attempt to serve his own ends. There is a merger of form and content between this latest, last-ditch effort, which we believe to be his brainchild, to save the Premises from the reach of the Plaintiff-creditors by using his wife as a stalking horse, and the underlying fraudulent conveyances and the frauds upon consumers perpetuated by USCC under Rhode's tutelage.

Secondly, we find Lorraine to be somewhat confused about the arguments which she is making. In her post-trial Brief, Lorraine argues, rather unbelievably, that, in *Fleet IV*, this court only intended to set aside the conveyance of January 28, 1983, and not the conveyance of September 28, 1982. Clearly, this is not so, as *Fleet IV* literally bristles with express statements that *both* of these conveyances are fraudulent and will, upon liquidation of the Plaintiffs' judgment, be set aside. *See* 89 B.R. at 424, 426, 427, Conclusions of Law, ¶ s 3, 4, 5, 6, 7, and 8.

At certain points in arguing and briefing her Motion, it appeared to us that Lorraine was arguing that part of the down-payment for the Premises was made by her, as opposed to its all having been made by USCC. It is true that, in *Fleet IV*, 89 B.R. at 422, Finding of Fact ¶ 9, we stated that USCC made "a down-payment of $50,000 ... out of [its] corporate funds ..." in the purchase of the Premises. It now appears that the total down-payment made when the Premises was purchased was closer to $60,000 than $50,000. However, it does not follow that we ever meant to suggest that Lorraine, or any entity other than USCC, paid any portion of the downpayment made upon the purchase of the Premises. In *Fleet IV*, we made no conclusive finding regarding the price of the Premises or even of the downpayment, since these issues were not important to the matters actually at issue in that proceeding. What we meant to note, in our statement, was that the purchaser, *i.e.*, USCC, made the *entire* downpayment.

In our mind, it is very difficult for Lorraine to argue that, the conveyances of January 28, 1983, and September 28, 1982, both having been invalidated, she has any interest in the Premises. She has not attempted to trace any of the downpayment to her own funds. Even if she had done so, we believe that her and Rhode's using the vehicle of USCC to purchase the Premises cut off her ability to trace the funds any

further. We recognize that only Rhode is a judgment debtor of the Plaintiffs. If she and her husband had initially purchased the Premises by the entireties, and then Rhode had transferred only his interest to her, her interest in the property would be preserved and her rights vis-a-vis Rhode could perhaps be traced. *Compare ESB, Inc. v. Fischer*, 185 N.J.Super. 373, 448 A.2d 1030 (1982). However, here, the title to the Premises, by the invalidation of the two fraudulent conveyances, will be returned to USCC, which *is* a judgment debtor of the Plaintiffs. Consequently, after the conveyances are set aside, Lorraine will retain no interest in the Premises.

Lorraine's principal argument, at the close of the hearing, appears to be that she is entitled to reimbursement for all of the payments that she made towards the Premises. However, as the court indicates in *In re Palermini*, 113 B.R. 380, 384–85 (Bankr. S.D.Ohio 1990), it is doubtful that payments made by a wife towards upkeep of a marital home which are mutually beneficial to her and her husband would give rise to a claim on behalf of the wife.

Furthermore, it is clear that any such payments made by Lorraine are merely allowable as credits to be set off towards any "rents and profits" attributable to her over the period of the payments. *See Newman v. First National Bank*, 76 F.2d 347, 351 (3d Cir.1935) (applying New Jersey law); *ESB, supra*, 185 N.J.Super. at 379–82, 448 A.2d at 1034–35; *Burne v. Partridge*, 61 N.J.Eq. 434, 437, 48 A. 770, 771 (1901); *Kinmonth v. White*, 47 A. 1, 5–6 (N.J.Eq.1900); *Mead v. Combs*, 19 N.J.Eq. 112, 115, *reaff'd*, 26 N.J.Eq. 173 (1868); Annot., *Accountability & Liability for Rents and Profits of Grantee of Fraudulently Conveyed Real Property*, 60 A.L. R.2d 593, 619–28 (1958); and 37 AM. JUR.2d 806–07 (1968).

The participation of Lorraine in the fraud of Rhode is irrelevant to her obligation to set off her profits against her expenditures. *See Kinmonth, supra*, 47 A. at 5–6; Annot., *supra*, 60 A.L.R.2d at 619–28; and 37 AM.JUR.2d, *supra*, at 806–07. Also irrelevant is the fact that she received no rents from the property in hand; her residence in the Premises is imputed rent with which she is chargeable. *See ESB, supra*, 185 N.J.Super. at 380–82, 448 A.2d at 1034–35; *Kinmonth, supra*, 47 A. at 6; Annot., *supra*, 60 A.L.R.2d at 617–18; 37 AM. JUR.2d, *supra*, at 806. *Cf. In re Hursa*, 87 B.R. 313, 319 (Bankr.D.N.J.1988).

For several reasons, we have decided that, under the instant set of facts, the setoff of Lorraine's payments against the imputed rent for the Premises chargeable to her should result in a cancelling out of any further obligations and rights of the Plaintiffs and Lorraine against and from each other *inter se*. Firstly, with respect to Lorraine's claims, we find that, despite her protestations, she was very likely to have been quite aware of the fraudulent nature of the conveyances. This knowledge could, in any event, be imputed to her as the principal of her agent-husband. *See Paolino, supra*, 75 B.R. at 644–50. Since she is found to have been a party to the fraud, at least in the sense that she was a beneficiary of its fruits, her right to recover for any payments over and above the imputed rent should be eliminated. *See Newman, supra*, 76 F.2d at 351; *Kaplan v. Heiles*, 107 N.J.Eq. 443, 445, 152 A. 855, 856 (1931); *Besson v. Eveland*, 26 N.J.Eq. 468, 471–72 (1875); and Annot., *supra*, 60 A.L.R.2d at 618. *Cf. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1300–01 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987) (applying Pennsylvania law).

On the other hand, we are unwilling to grant the Plaintiffs' Motion and award them any additional sum, in addition to the right to execute on the Premises without remittance of any allowances to Lorraine. Even though we disbelieve Lorraine's testimony that she made *all* of the payments towards the upkeep of the Premises, clearly she *and her husband* made these payments from pooled resources which included her earnings. Some credit for expenditures is therefore appropriate.

Secondly, we find that, although Cohen's analysis that a very high imputed rent should be chargeable appears theoretically

sound, Cohen himself acknowledged the shortcomings of his findings when applied to the practicalities of the instant fact situation. He conceded that no one would be likely to pay a rent of $3,251 monthly to live in the Premises. Its imputed rent probably approximates only some small degree more than the $1,500 to rent the townhouses in the area mentioned by Cohen. The monthly expenditures of the $1,150 mortgage payment, plus the taxes and other utilities, which appear to be in the $2,000 per month range, is, we believe, the equivalent of the imputed rent.

■ Finally, we note that a creditor's failure to make a "seasonable application for an accounting" is generally recognized as a basis to deny a claim to recover rents and profits from the grantee in a fraudulent conveyance. *See* Annot., *supra,* 60 A.L.R.2d at 612–13.

The Complaint in this proceeding, filed over three years ago, makes no reference to a claim for rents and profits. No such claim was made until *after* the briefing on Lorraine's Motion. Confronted with this fact on July 10, 1990, the Plaintiffs' counsel could resort only to the Complaint's general prayer for "such other relief as is just and proper" as a basis for such a claim. This basis is insufficient notice of such a claim. The very fact that the Plaintiffs filed the instant, separate Motion seeking such relief is an implied concession that the Motion was necessary to bring such a claim before the court.

■ The failure to timely make a claim for rents and profits is a waiver of same. *See Janson v. Schier,* 117 N.H. 570, 375 A.2d 1159, 1160 (1977). Placing such a claim "at the foot of the judgment" has been deemed a waiver, *Wolfson v. Samfred Holding Corp.,* 237 App.Div. 913, 262 N.Y.S. 102, 103 (1933), as has the failure to raise such a claim in the initial fraudulent conveyance proceedings. *See Maasch v. Grauer,* 123 App.Div. 669, 108 N.Y.S. 54, 55 (1908); and *Searing v. Cohen,* 191 Misc. 123, 76 N.Y.S.2d 771, 776 (Mun.Ct.N.Y.City 1948).

Moreover, we find these results logical. Parties challenging a fraudulent conveyance should place the grantee on notice of the full nature of their claim as soon as possible, in order that the grantee can intelligently determine whether it serves his interest to remain in the property or to proceed to liquidate it as soon as possible. Since the Plaintiffs never made any claim from either of the Rhodes for rents and profits received from the Premises over the first three years that this proceeding was pending, the Rhodes could logically assume that any such claims were waived. This assumption appears accurate and we will deny the Plaintiffs' motion on this alternate ground, as well as the ground that the Rhodes' expenditures and upkeep of the Premises is approximately equivalent in value to the imputed rental value of the Premises.

Thus, we shall recommend denial of the Plaintiffs' Motion as well as denial of Lorraine's Motion.

*E. Conclusion*

We will make Recommendations to the district court that it enter a final Order consistent with the conclusions reached by us in our within Report.